case of this morning. Gibbs v. Shannon, number 13-4402, Messrs. Brunman and Barker, and take your time setting up. Whenever you're ready. Good afternoon. I'm Mark Brunman. I represent Barry Gibbs. I'd like to reserve two minutes for rebuttal. That's fine. It has been more than 31 years since George Neal was killed. For that entire time, essentially that entire time, Barry Gibbs has been incarcerated. I've been before this court three times now, but the Commonwealth of Pennsylvania still has failed to afford Mr. Gibbs a constitutionally adequate trial. The court has instructed the parties to address a single issue. I've attempted so far and successfully to ask the court to expand the scope of the Certificate of Appeal Ability, so the issue for today is a straightforward one. Pennsylvania charged, tried, convicted, and sentenced Barry Gibbs for multiple conspiracies when no rational jury could have found, based upon the evidence presented at trial, that there was more than a single overarching conspiracy. Can you explain to me how it came to pass that he was actually convicted of a conspiracy to murder and a conspiracy to commit aggravated assault? One against Mr. Neal, one against Mr. Burke. How did the charge change, and does that matter far enough? So, I wasn't there at the state level, so this is my understanding of it. So, originally Gibbs was charged with murder one, capital murder. He actually got the death penalty the first time. So, in my understanding of it, in the original charging instrument, he was charged with conspiracy to commit, essentially, first degree murder of both Burke and Neal. And then, at his second trial, the jury returned a verdict of third degree. I think I'm getting this right. Mr. Baker will correct me. At his second trial, the jury returned a verdict of third degree murder. And so when he went to trial a third time, the murder charge was third degree murder. And at some point, and maybe Mr. Baker knows the exact point, the trial judge decided not to present to the jury the charging instrument of conspiracy to murder Wayne Burke, and I think I know why, but instead changed it to a conspiracy to commit aggravated assault. The trial judge, and this is part of one of his opinions, addresses this issue. He believed that conspiracy to commit aggravated assault was a lesser included offense of conspiracy to commit murder. On appeal, the superior court rejected Gibbs' challenge to that. Gibbs argued that it could be, in addition to the issue addressed in these briefs, Gibbs also argued that he couldn't be convicted of conspiracy to commit third degree murder, because third degree murder is an unintentional murder, whereas conspiracy requires intent. And the appellate court determined that the conspiracy to commit murder of Neal was not objectionable because it was accomplished. And the conspiracy with respect to Burke was not objectionable because he wasn't charged with conspiracy, even though it wasn't accomplished. And the reason I'm interested in this in part, and I've got a couple others, but on this point, is the briefs all talk about the fact that he was charged with two different conspiracies, one to murder Burke, one to injure or harm Mr. Neal. But in fact, the jury was told conspiracy to murder as it relates to Neal, conspiracy to commit aggravated assault as it relates to Burke. And that's what the jury was told. They were never asked to do anything other than make those two decisions. And why doesn't the evidence from a reasonable juror's point of view support the existence of those two conspiracies? Okay, so I'm going to answer that question, but I just want to circle back and finish your question, which is what's the significance of it? And in my view, the significance of it goes to the remedy. That is, to the extent the court is inclined to grant the remedy, the default remedy or the minimum remedy when there's a multiplicity violation is to remand for resentencing. But I think in this instance, and, I mean, 99.9% of the cases, that's the remedy. Actually, wouldn't you just remand to find out which of the two convictions should be vacated if we were to rule in your favor? That's the – And would it really make any difference here? So that's the typical remedy. But there is case law that where the multiplicity violation prejudiced the trial, that a new trial is warranted. And I would submit that this is one of those cases, and maybe I'll come back to it at the end, because I don't want to forget Your Honor's question. But I did want to address that at one point, why I think this case demands to the extent the court's inclined to grant relief, a broader remedy. We'll get to that, because I think there's an answer to it, even though there may be a good argument that you have on the merits. The question is, can we get that argument? But let's deal with Judge Schwartz's question here, because it's key. So the – and if I'm remembering the question correctly, because I may have distracted myself. The answer is that the jury could not have reached that conclusion, quite simply because the crime of conspiracy is the agreement, the scope of the agreement. And that agreement can encompass multiple unlawful objectives. That's the well-established constitutional principle in Braverman. It also happens to be the Pennsylvania own statutes, I think it's section 903C. It says it in so many words. You can have multiple objectives. And there simply was not any evidence whatsoever from which a jury could have concluded that there was a separate agreement as opposed to an agreement that encompassed multiple objectives. And the way – listen, to some extent it's an inchoate determination, but there were factors that courts looked to to make that determination as to whether there's one or more agreements. And all of the courts, the one thing they did right is they did focus on those factors. Yeah. But they got them. One question, what is an inchoate determination? I don't know. Yeah, I didn't either. So what I meant was – what I meant by it, and I probably shouldn't get distracted, was that to some extent it's the fluff – I had a professor who used to call it the fluff of the peach, which is in essence it's what your Honor's determined it to be based upon a consideration of those factors. It's not a separate agreement unless your Honor has decided it is. Well, let's put aside for a moment the fact that the jury was only charged to determine whether there was a conspiracy to commit an act of assault versus a conspiracy to commit murder. Let's put that aside. What proof do you have from the trial record, and we're only looking at trial record number three, that the conspiracy to harm Neal involved anyone other than Mrs. Burke and Mr. Gibbs? All the evidence with respect to the execution of the act, which is – and actually this goes to actually the second prong of the error, which is an unreasonable determination based upon the facts, which is the trial – the state courts and I think the federal court premised their decision of two agreements on the fact that there were different conspirators and that only Sharon Burke, the wife, and Barry Gibbs were involved in the separate conspiracy. But that's not – That was the court's interpretation of the evidence. What evidence would you point us to to say that the other conspirators, which was Jenny Dean and the two juveniles, were participants in the Neal conspiracy? Right. So what the court specifically said was that only Burke and Gibbs discussed this concept of harming Neal, and that's why there were different participants. But that actually isn't so. What evidence do you have that they all participated in these discussions? The evidence might be that they were around when they happened because they were able to relay that they occurred. But what evidence do you have to show they participated in the complication? So they went along. First of all, the courts were wrong because they were present. So they heard the conversations. They witnessed the preparations for it. They went along in the car. They didn't – there was additional discussion in the car, which they participated in. What was the evidence of conversations in the car from the house to Hemlock Farms? Well, the evidence is that there was conversation between Sharon Burke and Barry Gibbs. Around the house? I'm certain that it was in the house. I'm not sure there was in the car. I know that the Commonwealth has argued that that plane wasn't even – they got it wrong – but that it wasn't even discussed until they got in the car. And I'd have to look. Whatever there is is laid out in my brief. But at the very least in the house, and then when all were present, I think in the car, but regardless, all were present in the car, went to the scene of the crime. Barry Gibbs went out. And that's the evidence in the trial. And the crime was committed. So from your point of view, the evidence is that they're present. That would be your argument as to why the trial courts heard in their inferences on the evidence, that they were present when Sharon Burke and Barry Gibbs had this discussion. So as a defense attorney, I love the phrase mere presence. But in this particular instance, it's more than mere presence because they were – accepting the commonwealth's evidence – they were present as conspirators to commit a crime. So it's not simply that they were present and divorced themselves from one aspect of it. They went along knowing that in the house it had been discussed that this was a possible result of what was about to be committed. I don't see how those can be divided. Now, if one had stayed home, that's something different. So if you were representing one of these girls at trial, you would be arguing they were only present and therefore aren't responsible for what happened to Mr. Meehan. Right? You'd be arguing the evidence as a different inference. And the reason why I ask that is not to put you on the spot, but mindful of what the responsibility of the court is at this stage, which is to be very deferential and to determine whether a reasonable juror, based upon the evidence, could conclude as was concluded by the jury here. And so couldn't the same argument be made to say they were only there? They were merely present as it relates to the conversations that were going on with Mr. Meehan. We're going to assume there was sufficient evidence to have them as conspirators in the Burke conspiracy. So I don't know what I would have argued on their behalf. I do know that they entered into plea agreements. And correct me if I'm wrong, but I don't believe their pleas were to the assault of Burke. I believe they were. They weren't to the assault of Burke. They were to the murder of Meehan. I believe so. But I'm not 100 percent certain. Within the record, we only have a footnote concerning the dispositions of their cases. Yeah. And that may be because from the materials I received, I don't know how they resolved them. At least one of them was a juvenile, so I don't know. We only have what we have in the record. So maybe Mr. Baker can clear that up. But they most certainly – and listen, they may have only admitted the aggravated assault as part of a plea agreement. Or they might have pled guilty way before anybody started to change the charging instrument from being a conspiracy to commit murder against Burke and injury or harm Mr. Meehan. But I would say pled guilty long before trial number two. That certainly is true because the charging instrument was never changed, and it only arose in the second trial. It was two conspiracies to commit murder. They also were charged as juveniles, and that's probably a whole other set of charges. I think it was – one of them was. I'm not certain about the other. So – I told you I'd give you a chance to deal with the admission of psychiatric testimony. The problem you have to – what you have to surmount there is that you have to show that there was a violation of clearly established Supreme Court law. I can't find anything. So – I can't find anything that's on point, let alone clearly established. So I didn't prepare to address that issue. The issue I wanted to circle back to was the scope of the relief in this particular case in terms of the multiplicity violation. I did – I briefed the issue and quite genuinely I think I'm going to file, when the time comes, an application – a motion for a hearing on that particular issue. But I didn't expect that I would be given that opportunity. I wish I had known I would have prepared. Okay. I thought you said at the outset that there was a certificate of appealability. You were asking that it be expanded, and I thought you wanted to – Well, I had filed a motion, and it was denied. So I didn't expect that it would be addressed. That's fine. No problem. But it is addressed in my brief, and as I said, I'm going to try to raise it again. But with respect to the relief for the violation that the court has granted, that's within the scope of the court's certificate of appealability, as I said, listen, the minimum relief for a multiplicity violation is a new sentence, is a vacating conviction, and we may make a new sentence. But my question previously was would that make any difference here? So my argument is that it does because there are broader reliefs as warranted where the violation caused prejudice relating to the trial. Now, the typical prejudice, and I've cited cases on page 23 and 24 in my brief, is that having multiple counts somehow psychologically affects the jury. Candidly, that's never enough to grant more than a new sentence. At least I haven't found a case. But there are cases that where the multiplicity error impacted the trial, and the example typically is that where evidence is admitted to be good. And that's not this case. That's not this case. But it does support the notion that where there's prejudice to the trial, there should be broader relief. And in this case, the jury, the prejudice to having the second conspiracy charged is that it affects actually the murder charge because the jury here got what the federal practice would call a Pinkerton charge, which is if you find him guilty of a conspiracy, then you can find him guilty of the underlying offense. And there's no way to know. But the question really is, is there one conspiracy or two conspiracies? And maybe we'll get you back on rebuttal. And let's ask Mr. Barker some of those questions that relate to it. Thank you, Your Honor. James Barker from the Pennsylvania Office of Attorney General on behalf of the respondents. To answer that last question, that's actually done rather routinely where we charge multiple counts of conspiracy, and they merge for sentencing. But where you have multiple objectives, it's very hard to draft a verdict slip or even a charging document with one count of conspiracy with all of those objectives. Well, it seems here that when I look at all of the six or seven factors, my concern was one was a common over X. And both conspiracies shared the same over X, including Gibbs changing to less conspicuous clothes, Sharon providing Gibbs with a gun, Sharon driving Gibbs to the Hemlock Farms security place where Mr. Burke worked and Mr. Mel worked. When I look at overlap, do you want to address that first? Sure. The over X that you've mentioned until they get to the housing development would only apply to the first conspiracy to murder Mr. Burke. And the reason is the agreement hasn't even been formed yet. So you can't have an over X in furtherance of the agreement until the agreement is reached. There were these factors. That sounds like you're talking about the common objectives factor. Now, both shared a common objective. That was to kill Wayne Burke. Well, the first conspiracy had that objective. There were actually separate objectives because there were separate agreements. Well, they sort of debated it. I mean, what happens if there's somebody else there? And I thought Sharon instructed Gibbs to injure or kill Mel if need be, but it was to facilitate Wayne Burke's murder. Correct. But the other participants in the conspiracy were not part of that agreement. They were simply present. Yeah, at this point I'm just talking about Mr. Gibbs and Sharon Burke. And actually that discussion occurs on the way to the development in the car. There's no record. On the way to Hemlock Farms to where Mr. Allen Burke was? Correct. Where in the record is that? I couldn't find any evidence of that. I looked at the pages that you cited in your brief, and it's through Bonnie Burke's testimony. Correct. Bonnie Hagan, I'm sorry. Bonnie, forgive me. And then it seems that she's making clear that those statements happened at the house. Now, I don't know if it matters where the conversations took place. Yeah, that's my understanding as well. But I thought those conversations happened at the house. It seemed clear to me as well. Then I apologize if I've misread the record. My understanding from a chronological standpoint is that she was talking about the trip to the housing development, Hemlock. However, they occurred earlier. I don't think it would matter. The problem still is that you have two completely separate agreements. The other persons who were involved in the conspiracy to murder Mr. Burke never agreed to anything about harming Mr. Meal. And the case that I've cited on this is Commonwealth v. Kohler. And in that case, the defendant, claiming to be training his co-defendant as a hitman, had him murder the defendant's girlfriend. However, the girlfriend had a son. Right. So after the first murder was committed, he then had his hitman protégé murder his girlfriend's son. And that was to facilitate the first murder. In other words, to cover it up. As he stated, it was to get rid of the loose ends. That's very separate. The methods of operation here were, to me, identical. He comes and he shoots at both men at the same time, hoping to hit Wayne Burke. He did nothing else. Unfortunately for Burke, he wasn't hit. Unfortunately for Mr. Meal, he was. And that's correct. However, the agreements are two separate matters, just as in Kohler. The agreements are reached at different times. So you have Sharon Burke agreeing... Was the example you just gave me that somebody was to be killed, what, after? It was done after the first murder, but in order to facilitate that... And I agree with that. However, the agreements were at separate times. They were completely separate agreements, and that's how it's analogous. In other words, you're still facilitating the murder that you want to commit through another conspiracy. So it can be a separate conspiracy. It seemed to me, just thinking about this in a very colloquial way, that there is a desire of Sharon Burke to get rid of Wayne Burke. And then the question becomes, somebody else might be there. What do you do? He, in the process of trying to kill Wayne Burke, this person could be, quote, collateral damage, close quote, words we often hear in connection with the military. Isn't that really all part of one thing? I mean, hey, somebody else might be there. What do you do? And the answer is, you try to kill Wayne Burke, and if somebody else is hit collaterally, that's the way it goes. And that would be true if we were proceeding under a theory of accomplice liability. However, we're proceeding under the law of conspiracy, and it's a separate matter because there are two separate agreements. And I guess a way that I would analogize this, say, to contract law, if I were at Walmart and I wanted to sell some candy, I still need to buy some shelves to do it. I'm going to have two contracts to accomplish the same goal. And that's what we have here, two agreements to accomplish, ultimately, the murder of Mr. Burke. Agreements with the same overt acts and overlap in personnel, the exact same time period, the exact method of operation, the exact location. Common objective was to kill Wayne Burke, and the degree of interdependence required for success, harming or killing Mel was viewed as potentially necessary and intermediate step to killing Burke. And none of that changes the fact that the ultimate agreements were separate. And is it your view that that's because from February until March, until March when everybody met Gibbs for the first time, the only people who were talking about the murder of Burke were Jenny Dean, the other people who were brought in to try to participate and decline to, the daughter and the stepdaughter, and Sharon Burke. So this is a frame of reference difference maybe is what I think Judge Amber is pointing to, is he's focused on what occurred on the last day of the conspiracies, plural, because that's your view. In order to accomplish each goal, they went through the same acts. That doesn't change the fact that the agreements were separate, correct? From your point of view, they're different because they sprung up at different points in time. From your point of view, there are different participants. Correct. And your view is that the daughter and stepdaughter did not join the Mel conspiracy. Correct. And what I would add to that, to use my contract analogy again, ordinarily in a conspiracy, we do not have clear evidence of agreements. We have to do it by the totality of the circumstances. And that's what the various factors really go to. Here, we have our contracts. We have Bonnie Hagan Sullivan testifying. It was this agreement to murder Wayne Burke. It was this agreement later to injure Mr. Meehl. Well, she testified about what she heard her mother say. Correct. Correct? Right. Is there any other evidence that could make her a participant in the Mel conspiracy? No, there is no other evidence. There's no indication that any of the other participants in the Wayne Burke conspiracy entered into the Mel conspiracy except for Sharon and Mr. Gibbs. Could one look at this evidence and view the injure or kill Mr. Mel as an act in furtherance of the conspiracy to injure or kill Mr. Burke? And if so, isn't that the charging problem that needs to be presented here? That if it was only charged as a conspiracy to murder Mr. Burke, presumably the Commonwealth would have sought to introduce evidence of the harm to Mr. Mel. That's certainly true. And in our parlance, we use race jest. It's sort of the full development of all of the facts and circumstances. However, that doesn't change the nature of the agreements. Simply because the evidence is admissible and relevant would not change which offense you're looking at. I'd like to just follow up if I could. There were two other things that were in the Superior Court's opinion that I wasn't able to find any support for. And I don't know if it's consequential, but I'd like to point them out because we do have to review to make sure that facts are entitled to deference. And one had to do with a statement that Gibbs conducted target practice at the Burke residence. And it was the boyfriend of the daughter, correct? That's correct. And also, I believe it was Jenny Dean who also tried. Jenny Dean. It wasn't the boyfriend. You're right. It was Jenny Dean. The second is conversations with Gibbs concerning the Burke murder at a, quote, business establishment. My understanding from the record is the only time that Mrs. Burke and Mr. Gibbs were together was after they picked him up at the caboose, brought him to the house, had a conversation in the house, got in the car, drove to Havelock Farms, and then left the scene. So that appears to be another incorrect statement. I believe that's correct. They may have been inferring that there was discussion at the caboose, but I don't believe there was. It was simply picking him up and taking him to the house. We've already talked about the fact that none of the three of us didn't see any evidence in the record that there was a conversation in the car from the house to Havelock Farms. Correct. And if that's my misreading, I apologize. If that's the case, then I'm sorry. No, you're right. If we – should the fact that these errors appear to be innate, should that influence our ability to give deference to the court, the superior courts? No, because I believe that those errors don't affect the ultimate disposition by the superior court. When the conspiracy was – we talked about whether the people, the two daughters that were in the car, whether they were involved in the conspiracy with regard, or purported conspiracy, with regard to the killing or harming of Mel. Did the other daughter ever say anything at any time with regard to the killing of Burke? There was no evidence in the record that she actually said anything. That's my recollection as well. The only thing that she did, and off the top of my head, I can't say that there's a specific spot in the record to look at this. I don't recall a disposition for her. My impression is that there's nothing in the record that I could find either, that she was silent. She basically wanted to know what was going on and then sort of was present for the rest of it. Did she look for either the photograph or the sneakers or the sweatshirt, or was she involved in any of that, or was that her stepsister? I believe that was the stepsister. All right. What would be the appropriate remedy if we were to find that there was only a single conspiracy here, that he couldn't have been charged with both conspiracies? I believe the appropriate remedy would be for the case to be remanded in that sense. I guess remand is not the technical term, but for the court of common pleas to re-sentence. The multiplicity argument, as I've said, I don't think that really applies here. We charge conspiracy in multiple counts routinely. You mean like consecutive five- to ten-year sentences on the two conspiracy counts? Correct. However, in Pennsylvania, when a sentence is imposed, we use a sentencing scheme so that each individual count is relatively unimportant. What you're looking at is the aggregate sentence, and that's how the Pennsylvania courts treat their judgment of sentence. I see. Okay. And the aggregate was 25 to 50 here? Correct. Okay. And so the remedy would not be our direction to vacate the count of conviction? It would be to vacate that count of conviction, but not simply vacate that aspect of the sentence. It would be to – Which count would we be vacating under this scenario? It would be the lesser of the two counts of conspiracy, which would be the aggravated assault. Okay. Thank you very much. Mr. Berman? Just briefly, I think three points. So one, to the question as to what the evidence in the record was with respect to discussions happening after leaving the house, I see in my reply brief on page 7, footnote 3, I addressed that issue, and there was, when they were in the car, when they arrived at Hemlock Farms, Sharon Book pointed out George Meal to Gibbs, and my argument is that no one left, everyone stayed, no one left, everyone participated, went through as the conspiracy came to fruition. That's A. Mr. Baker says that there's no evidence that others participated in the Meal conspiracy. Well, here's the reality. The trial court charged the jury that the conspirators were Sharon Burke, Bonnie Burke, Betsy Burke, Jennifer Dean. That was the charge to the jury, and I think the jury charges in the appendix around 1240, 1241 on conspiracy. And so this jury was told that those were the conspirators, and that's, by the way, the evidence in the case, that they all went along together. And Judge Schwartz asked whether the errors by the state court are consequential. Well, they are consequential, particularly the error with respect to overt acts. Mr. Baker says over and again there were simply separate agreements. Well, you can't just say it. That's a conclusory sentence. There are factors that the courts look at, and Judge Ambrose was going through them, one of which is the overlap of overt acts, and the only overt act that the courts point out as being different was this notion that Barry Gibbs engaged in target practice the day before. Well, it turns out that's not supported by the record at all. And Mr. Baker, neither Mr. Baker nor the courts have pointed to a single overt act, not a single one with respect to that. You said Baker. Is it Baker or Barker? I keep saying Barker. I apologize. I apologize. All right. I knew one of those was wrong. I'll start from the beginning. But there's not a single. If it's Barker, we'd be upset. Yes. If she's still with us. There's not a single overt act that anyone, no judge, no advocate, no one has identified a single overt act that distinguishes the two, the quote, unquote, two conspiracy that would support a conclusion that there were, in fact, separate agreements. And that's why that mistake is particularly consequential. And the other factors that courts look at also are entirely overlapping. The time frame, the reality is that this was all occurring, the time frame was from February of 1984 through March. But for most of the time, it was just Sharon Burke talking in her head. And, in fact, the evidence of trial was that. Okay. She had her daughter go out and get her friends to come to the house, and she talked to them and offered all kinds of emoluments, and they chose to participate. So, I mean, maybe at the beginning it was taught, but it appeared to be more memorialized thereafter. Correct. Correct. But that's the point I'm making, which is they said the argument is wrong. It's from February. But from February to essentially almost March 26th when this Gary Huff or Jennifer Dean engaged in target practice, it was Sharon Burke. In fact, I think the evidence was Bonnie, the older daughter. Bonnie testified that she didn't believe her mom. She thought she was just talking. And it was only when you get much closer to March 27th that actually Betsy Burke wants to know what's going on. They all go down to recruit. They recruit Jenny Dean. They recruit the others. So the time frames, and particularly the critical time frames, was essentially a lie. What ultimately happened to Sharon Burke? What was she convicted of? She was acquitted. She was acquitted of everything. Everything. She was acquitted of everything. It's something. That was good lawyering. And the younger and the older daughters, were they accused of any things? They were. Mine says they both entered guilty. I don't know. I don't know the circumstances. Okay. Thank you very much. Thank you to both counsel. And we'll take the matter under a vote.